```
 1

 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   ---------------------------------------X
     DONALD LITTLE and TERRENCE JOHNSON,
 4   Individually and on behalf of all others
     similarly situated,
 5
                                  PLAINTIFFS,
 6
              -against-         Case No:
 7                              15-CV-07423

 8   CARLO LIZZA & SONS PAVING, INC., SHIPS
     POINT INDUSTRIES LTD., A&B CONTRACTORS LLC
 9   and ELIA ALY LIZZA, jointly and severally,

10                                DEFENDANTS.
     ---------------------------------------X
11

12                  DATE: August 26, 2016

13                  TIME: 11:00 A.M.

14

15

16          DEPOSITION of the Defendants,

17   CARLO LIZZA & SONS PAVING, INC. and SHIPS

18   POINT INDUSTRIES LTD, by a Witness, ALY

19   NICHOLAS LIZZA, taken by the Plaintiffs,

20   pursuant to a Notice and to the Federal

21   Rules of Civil Procedure, held at the

22   offices of Pelton & Graham, PC, 111

23   Broadway, New York, New York 10006, before

24   Risa Karr, a Notary Public of the State of

25   New York.
```

DIAMOND REPORTING   (877) 624-3287   info@diamondreporting.com

```
 1                     A. LIZZA
 2    If you don't understand a question, please
 3    let me know and I will rephrase it.
 4    Sometimes I ask bad questions.
 5         A.    Okay.
 6         Q.    Your attorney may object to one
 7    of my questions.  Unless he tells you not
 8    to answer it, he is preserving his
 9    objection on the record, but you can go
10    ahead and answer the question.
11               If you don't understand
12    anything, please let me know.  And if you
13    need a break, please let me know, you can
14    take a break.  I ask that you answer any
15    question that's been asked of you before we
16    go on break.
17               Is there any reason why the
18    testimony you are going to give today would
19    not be accurate?
20         A.    No, I don't see why not.
21         Q.    What type of work do you do?
22         A.    I do heavy road construction.
23         Q.    For who?
24         A.    For Carlo Lizza & Sons.
25         Q.    What is your job position with
```

```
 1                    A. LIZZA
 2   Carlo Lizza & Sons?
 3           A.     I'm a project manager.
 4           Q.     Can you tell me a little more
 5   about the company Carlo Lizza & Sons?
 6           A.     Yeah, sure.  We are in the
 7   heavy road business.  Mainly in recent
 8   years we have done a lot of milling in New
 9   York City.  That's the majority of what we
10   do now.  We used to do a lot of work in
11   Long Island, but the market has changed
12   over the years and around the time I was
13   about 24 or 25 when I started to get really
14   involved and I bid my first city milling
15   job and ever since then I have been in the
16   city.
17           Q.     You were 24 or 25 when you bid
18   a city milling project?
19           A.     Yeah.
20           Q.     When was that?
21           A.     I believe it was 2011 and the
22   work was to be done in 2012, I believe was
23   when we first started working in the city.
24           Q.     What is the ownership structure
25   of Carlo Lizza?
```

```
 1                    A. LIZZA
 2        A.    My father Elia Lizza, E-L-I-A,
 3   Elia Lizza he is the sole owner of the
 4   company.
 5        Q.    Do you have any siblings who
 6   also work with the company?
 7        A.    I have a brother that around
 8   the same time, around 2011, left the
 9   company that he was working for that my
10   cousins and my uncle work all together and
11   came back to work with my father and I.
12        Q.    From 2011 to the present, does
13   Carlo Lizza consistently have revenues of
14   at least 500,000 per year?
15        A.    Yes.
16        Q.    What is the management
17   structure of Carlo Lizza?
18        A.    My father comes in once a week
19   and does payroll.  He deals with the bank,
20   deals with the bonding company, deals with
21   upper management, which would be myself.  I
22   handle all New York City, anything in the
23   boroughs.  And my brother, Keith, handles
24   all of Long Island.
25              Then underneath us you would
```

```
 1                    A. LIZZA
 2    the city we assumed it was the same.  And
 3    only later did we find out that it was not
 4    the case.
 5         Q.   What does that mean?
 6         A.   In Long Island there is a
 7    prevailing wage and a schedule for
 8    flaggers.  In the city there is no such
 9    job.  They have something similar called a
10    crossing guard that stays outside of the
11    construction area and they direct foot
12    traffic that the street is closed and
13    vehicular traffic, that they are not
14    allowed to come down the street.
15         Q.   You were saying that the
16    crossing guard directs foot and vehicular
17    traffic?
18         A.   Yes.
19         Q.   When did you first learn that
20    there was a distinction between the
21    flaggers in Long Island versus the city?
22         A.   I would say beginning of our
23    second year.  Once I started to look at the
24    bid a little closer, the second time I
25    started looking at a bid and I started to
```

```
 1                    A. LIZZA
 2    look at the wage scheduling and there just
 3    was no -- nothing in there and we asked
 4    around what other contractors do and we
 5    heard that they had been paying the same
 6    people we had been paying a combined rate
 7    of almost $70 an hour 20 or $30 an hour and
 8    we said how could this be.
 9              We found out through, you know,
10    just people in the business that in the
11    city there are no flaggers.  The closest
12    thing to a flagger, I guess you could say
13    would be a crossing guard, but they are not
14    the same, though.  So we had made the
15    mistake of paying them as if they were.
16         Q.   What rates were you paying?
17         A.   The laborer's rate.
18         Q.   Did you speak with an attorney
19    to get the attorney's advice as to the
20    payment rate?
21              MR. ZISKIN:  Objection.  You
22          can't ask about attorney/client
23          privilege.
24         Q.   Did you speak with an attorney
25    regarding the wage rates to be paid to the
```

```
 1                      A. LIZZA
 2    crossing guard/flaggers?
 3              MR. ZISKIN:  That would be a
 4         yes or no question.  Do not elaborate
 5         on what your conversation was.
 6         A.    No, I didn't.
 7         Q.    You spoke with others in the
 8    industry?
 9         A.    Yes.
10         Q.    How many flaggers are required
11    on any one job?
12              MR. ZISKIN:  Objection to form.
13         A.    Zero.
14         Q.    How many crossing guards are
15    required on one job in the city?
16         A.    Wherever you have the limits of
17    the job.  Wherever the construction site
18    ends, where a car or a person would come in
19    either from the sidewalk or -- well, no,
20    not the sidewalk, from a street.
21              Wherever vehicular traffic
22    would try to travel the limits of the job
23    outside of the job.
24         Q.    The Long Island work, did you
25    have any crossing guards or flaggers that
```

```
 1                   A. LIZZA
 2        Q.    Yes, that's very dangerous and
 3   all too common.
 4        A.    Yes.
 5        Q.    Initially you had all the
 6   crossing guards on the Carlo Lizza payroll?
 7        A.    Yes.
 8        Q.    Then after working with Kevin
 9   Quick or meeting with Kevin Quick, the
10   crossing guards were transferred over to
11   the A&B?
12        A.    No, Kevin Quick I always dealt
13   with, but when I realized that this
14   crossing guard -- there was no prevailing
15   wage governing the crossing guards, they
16   could be paid minimum wage.  There was no
17   need for Carlo Lizza to have them on our
18   payroll any longer.  So we didn't insist on
19   it.
20        Q.    At that point they were able to
21   be transferred to A&B?
22        A.    He was able to do business as I
23   guess he had been doing before we had A&B
24   on our payroll.
25        Q.    Who oversaw the crossing guards
```

```
 1                    A. LIZZA
 2         Reporter.)
 3         Q.    I handed you Exhibit P-3 which
 4   depicts a milling machine on East, I
 5   believe, 80th Street in the city.
 6               Do you recognize this milling
 7   machine?
 8         A.    Yes, I do.
 9         Q.    Is that one of your milling
10   machines?
11         A.    I recognize this very well.
12   This was a special job we did for the city.
13   We did First Avenue from 72nd Street to
14   125th.  This was a federally-funded job and
15   as such all the flagmen and the crossing
16   guards were paid the prevailing wage for
17   the laborers for the duration of this job
18   which was three weeks.
19         Q.    The job lasted three weeks?
20         A.    In 2013.  This was a special
21   job.  This was concrete milling.
22         Q.    How many hours per week was
23   worked on this job?
24         A.    This job, I tell you the truth,
25   I think we did six or seven hours of
```

```
 1                    A. LIZZA
 2   picture --
 3        A.    On a road where width is big
 4   enough to permit buses and traffic of that
 5   nature through, the stop and go paddles
 6   were introduced to keep buses running.  So
 7   we would space barrels big enough so if
 8   they wanted to they could step aside for
 9   the MTA buses to go through.
10              So the stop and go paddle was
11   to stop the vehicular traffic and the go
12   was for when a bus would come.
13        Q.    Would the road be shut off to
14   other traffic?
15        A.    Yes.
16        Q.    So only the buses would get
17   through?
18        A.    Buses or like a garbage truck,
19   city stuff.
20              Taking a better look he may
21   have a stop and go paddle in his hand, I
22   just can't see because it is a bad picture.
23   I don't think so because it is a weird
24   spot.
25        Q.    Would the crossing guard or
```

```
 1                    A. LIZZA
 2    coming on to the job site and to keep
 3    vehicles from coming on to the roadway, on
 4    to the job site.
 5              So they would stand at the
 6    perimeter of the job outside the job site
 7    and direct foot traffic to come this way,
 8    ma'am, come this way, sir.  And they would
 9    use their hands and direct them, no, you
10    cannot come down this street, there's work
11    going on here.  Later on they had stop and
12    go paddles and they would just lean them up
13    against the barrels and it was actually a
14    problem.  They refused to use them.
15              One time a fellow slashed a
16    woman in the face.  You could see on A&B
17    insurance, a woman got cut because they
18    would just throw the paddles on the side
19    and we would get written up for standing
20    with them sometimes.
21         Q.   Were barrels ever placed at the
22    front of the street and crossing guards
23    would then be behind the barrels at the
24    crosswalk?
25         A.   No.  We have to put the barrels
```

```
 1                    A. LIZZA
 2   behind people.  You can't walk on the job.
 3   The whole point of them being there is to
 4   keep people from walking on the job.  The
 5   second someone walks on the job I'm getting
 6   sued, they are tripping, falling, getting
 7   hurt being hit by equipment.
 8        Q.    Had you ever seen a crossing
 9   guard operating at a corner within the
10   construction site?
11        A.    No.  What do you mean?  Like if
12   we were doing all four roads, if I was
13   doing this road and this road, they would
14   be here?
15        Q.    Correct.
16        A.    No.  Why would they be there?
17        Q.    To direct pedestrians.
18        A.    No, we put caution tape up and
19   down the streets to try and keep them from
20   coming.
21        Q.    On Plaintiffs' Exhibit 1 you
22   drew an X on the right side of the page
23   just above the Plaintiffs' Exhibit sticker.
24   Isn't that crossing guard in traffic?
25        A.    Like I said, I'm not the
```

```
 1                      A. LIZZA
 2    greatest artist.  Push that back ten feet,
 3    draw a crosswalk and put him over there.
 4         Q.    Would the crossing guard ever
 5    be behind the barrels but still at the
 6    front of the street?
 7         A.    No, the barrels are there so
 8    people see that that is where the
 9    construction zone is.  Also I got to be
10    able to work in here, so it is to keep
11    people out.
12               If they had the barrels out
13    back in the construction zone, how am I
14    going to get to that?  How am I going to do
15    work in that area?
16               They have to be outside of the
17    construction zone.
18         Q.    Do pedestrians ever cross
19    behind the barrels but at the front of the
20    street?
21         A.    They try to but we put type 3
22    barricades that say sidewalk closed and we
23    put yellow caution tape all around.  So
24    when they get here they have no choice but
25    to walk on the outside of the barrels and
```

```
 1                    A. LIZZA
 2   encounter someone such as Mr. Little.
 3        Q.    When they walk outside of the
 4   barrels, are they essentially walking in
 5   traffic?
 6        A.    In some cases it is pretty
 7   close.  They are not in traffic, but it
 8   could get pretty narrow depending on the
 9   street.  That's why we have these guys
10   there to protect them.  And if it is a
11   dangerous intersection like that, they are
12   there to slow the traffic down, make sure
13   these people -- say, hey, this is a
14   dangerous area, be aware.  You are crossing
15   close to a construction site.
16        Q.    You have never seen the
17   pedestrians cross behind the barrels?
18        A.    No.  I have seen them come out
19   of bars drunk in the morning and run
20   through my caution tape like it was the
21   Olympics, but we frown on that.  We try and
22   prevent that.  I can't say it never
23   happened in six years.  People, we're not
24   going to physically restrain them.  I'm
25   sure Mr. Little or whoever was there would
```

```
 1                      A. LIZZA
 2   shout at them and say, hey, guys.
 3         Q.    Did you ever see Mr. Little or
 4   any crossing guard walk with machines to
 5   make sure people did not come into contact
 6   with the machines?
 7         A.    Not the crossing guard, no.
 8         Q.    Did you see any crossing guards
 9   steering or directing traffic through
10   detours?
11         A.    No.
12         Q.    Did you see crossing guards
13   open the barrels and direct trucks and
14   equipment into the construction zone?
15         A.    I mean they might have touched
16   the barrels, but they were never directed
17   to do so and it was never necessary for
18   them to do so.
19         Q.    Did you ever see a crossing
20   guard sweep or shovel the crosswalk area?
21         A.    No.
22         Q.    Did you ever see a crossing
23   guard use a blower on the sidewalk?
24         A.    No, those are the laborers'
25   responsibilities.
```

```
 1                    A. LIZZA
 2         A.    Yes.
 3               MR. PELTON:  Mark this as
 4         Plaintiffs' 14.
 5               (Whereupon, the aforementioned
 6         cover page of a milling contract was
 7         marked as Plaintiffs' Exhibit 14 for
 8         identification as of this date by the
 9         Reporter.)
10         Q.    I'm handing you what has been
11    marked Plaintiffs' 14.
12               Can you take a minute to review
13    the document and let me know if you can
14    identify the document?
15         A.    Yes.  This is the cover page of
16    one of the milling contracts we bid.
17         Q.    Are the flagmen listed as a
18    classification of workers?
19         A.    No.
20         Q.    When you first paid them back
21    in 2012, 2013, did you pay them under the
22    laborer highway and paving section?
23         A.    I didn't do payroll, but
24    whatever we thought wages were, whatever
25    the prevailing rate in Long Island we
```

```
 1                    A. LIZZA
 2     thought comparable to that was we paid.
 3          Q.    Do you pay flag people doing
 4     the type of work Donald Little does out on
 5     Long Island?
 6          A.    They don't do the exact same
 7     thing in Long Island.  They are in the
 8     middle of the street and they are mainly
 9     directing active traffic, stopping and
10     going, letting cars stop and go.  They
11     direct construction, they can also labor.
12     It's a more -- there's no difference
13     between them and a laborer, basically.
14               So you don't have that many
15     dedicated flagmen, where in the city it is
16     every day that's all they do.  In Long
17     Island you won't find one person in 1298
18     that's just a flagmen.  That's a position
19     they are put in for that day or for that,
20     you know, job and then the next day they'll
21     be shoveling or raking, they'll be doing
22     something else.
23          Q.    When the milling machine comes
24     to the end of the block and when it raises
25     its grinder, does that leave a pile of
```

```
 1                    A. LIZZA
 2    estimate was wrong.
 3              MR. PELTON:  Mark this
 4         Plaintiffs' 16.
 5              (Whereupon, the aforementioned
 6         bid for Queens was marked as
 7         Plaintiffs' Exhibit 16 for
 8         identification as of this date by the
 9         Reporter.)
10         Q.   I'm handing you what's been
11    marked Plaintiffs' 16.
12              Can you review this document
13    and let me know if you can identify the
14    document?
15         A.   This is another bid that same
16    year for Queens and they forced you to bid
17    $75 an hour on the flagman.
18         Q.   Did you speak with the City of
19    New York as to why they forced you to bid
20    $75 per hour for the flag person?
21         A.   No, I was actually happy that
22    they did that because it is an equal
23    handicap.
24         Q.   What do you mean by that?
25         A.   It means I don't have to worry
```

```
 1                    A. LIZZA
 2        A.    No.
 3        Q.    Did you ever tell Mr. Little if
 4   he left the job site before the job was
 5   done he would be fired?
 6        A.    No.
 7        Q.    Did you ever say that to any of
 8   the flag people?
 9        A.    No.
10        Q.    Did you instruct Mr. Little to
11   walk with the machines in trucks from one
12   street to the next?
13        A.    No.
14        Q.    Did any flag people walk with
15   machines from one street to the next?
16        A.    No.
17        Q.    Were there daily inspection
18   reports performed for the Department of
19   Transportation on each of these jobs?
20        A.    I'm not sure.  What do you
21   mean?  The DOT is the client, DDC runs the
22   jobs.  So DOT -- I don't know what that is.
23        Q.    Did the DDC have an inspector
24   on the job?
25        A.    Yes, some of them.
```